If it pleases the court, good morning. My name is Abraham Walter and I represent the appellant Dawn Vivaritas. I've requested and I request again three minutes rebuttal time. It's granted. Thank you. I should start by saying that I think this case should trouble the court somewhat because everyone agrees that this person was not represented and that the ALJ did not obtain a knowing waiver. Why? It seemed to explain quite a bit there, didn't it? It's a she. Yeah, a she. Well, quite a bit, but not enough. The 25% contingency fee, is that what? That's important, especially since my client, my current client, didn't seem to know that. She said, I don't have money. I went to Legal Aid, but I couldn't find it. They told me it was on Market Street or whatever. I couldn't find it. This exact question where you could get a lawyer but not have to pay or something like that. Well, basically. That's not enough. No, that's not enough. And not only that, that no fee could be charged without being approved by Social Security. That's a major factor as well. And I don't think it's disputed here. I think the defendant admits it. The district court found it to be the case. So here, even though I could talk forever on different issues, it's really one issue. And that is, was the appellant prejudiced by this failure to obtain a knowing waiver? Well, let me ask you this. If she was told that you could get a lawyer for nothing, what could be better than that? I mean, that's even better than a contingent fee. I could answer that in many ways, Judge, but I don't even think it's an issue in this case. I mean, I don't think it's an issue. Well, there's no statute that I'm aware of or rule that lays down like a long list of things that you have to tell the person. I think the cases cited do go through them pretty well, that you have to tell them that there are lawyers you get for free, that there's a contingency fee agreement in all of these cases. It's not you can get a contingency. It doesn't exist otherwise. Every one of my clients is poor and sick. If I required them to put a retainer down, number one, they couldn't. Number two, Social Security wouldn't allow me. It's not illegal for me to take money from these people until Social Security approves the fee and I win the case, obviously. So, I don't think that's an issue, Judge. However, the District Court didn't think it was an issue either. The District Court found that the ALJ did not obtain a knowing waiver. Now, was the appellant prejudiced? Well, yeah. Any Social Security lawyer could have won this case with half their brain tied behind their back. There's so much evidence in this case that claim it was totally disabled, okay, and much of that evidence was not recited by the ALJ. Now, if you look at the transcript 270, the best piece of evidence that one could ever want to find in any Social Security case for the government or for a plainer is a totally objective psychological evaluation. Now, in Social Security world, there are no objective pieces of evidence. Either the government has their pieces of evidence or the treating physician tells you something. A hospital record might be an objective piece of evidence. Here, this woman was sent by vocational rehab. She wants to work. She goes to vocational rehab. They interview her and they send her right out for a psychiatric. And what that psychologist found was that she's functioning like a mentally retarded person. Well, isn't it the full range IQ score of 67? And I don't think that's on that page. 67 is the consultative examination by Dr. Candela, which the ALJ sent her for. Isn't that really what's helpful to you? That's very helpful. That proves she meets the listings. But even prior to that, in 1996, when she went to vocational rehab, it's 269 to 271, she functions more like a retarded person. She's 40 years of age and her reading level is grade one. Her arithmetic level is grade two. She's illiterate. Now, this is something that was before the commissioner. Most certainly. And she has a child development associate degree. What do we make of that? I'm glad you brought it up. Pardon me if I'm a little confused by this whole thing. First of all, she didn't even know what it was. She said, I have a CBA. The ALJ asked her, well, what is that? I don't know. She is a professional babysitter. That's what a CBA is. Vocational rehab sent her to the psychologist. The psychologist finds this woman is a functional, mentally retarded individual. So what does vocational rehab do with that person? They send them to try to work. And what work is available to these people with very limited judgment? They take care of six-month-old to two-and-a-half-year-old children. She worked two hours a day, six days a week. Well, and she couldn't keep those jobs because she had migraines that kept her out several days in a row. That is partially true. That's what the ALJ said. One job, she said, why were you laid off? I don't know. Probably I took off too many days from migraine. What about all the other jobs? She had three of these or four of these jobs. She was laid off by everyone. She never worked more than a year in any of these jobs. Why? She went to Burger King. Now, that's where high school kids go to get a little extra money. She couldn't get hired at Burger King. She couldn't get hired at Dunkin' Donuts. She has a 67 IQ, and she's functionally retarded. Although she did testify that she would work if she could find work. She wants to find work. In this country, Your Honor, nobody picks you up and takes you to vocational rehab. She is very motivated to work. She just can't keep any job because of these problems. What would a lawyer have done for this woman? Well, number one, she was special ed from kindergarten through high school. She graduated high school special ed. Do we have those records? Because if she was my client, we'd have those records. And we'd have plenty of IQ tests because every year on an IEP, they give you an IQ test to justify the immense resources that the government has to pay. You feel that would show mental retardation before age 22? Easily. Easily. She wasn't in special ed because she has ADHD or something. She has always been mentally challenged. Now, how challenged? It all depends, fifth grade, sixth grade. But when you're 40 years old and you're reading on a first grade level, you're illiterate. Is that a decision? Is that fine? Is the existence of the report in this evidence? Yeah, I would have done a lot for this woman. I would have found out what you need to get a CDA. Judge Greenberg brings up a CDA. And not only that, but the CDA people told her, this is like one year of college. Yeah. Well, wonderful. What do you need to get a CDA degree? Let me ask you something. If we did send this back, doesn't substantial evidence support the residual functional capacity? Certainly not. Okay. Certainly not. Of course, just to interrupt, what you're saying is that we should not really reach the merits. We should say she's entitled to a counsel and then reach the merits after that next proceeding. Well, in order for me to convince you that she needs counsel, I have to show you what I would have done or what a counsel is. And I'm not saying a lawyer you want. I want to make that clear. A representative. I want a lot more than that. I'm not going to get it. But I want a lot more than that. What I want is this court to at least mull over the issue that when a claim comes before an ALJ with a documented mental impairment, not I'm depressed because the meds lost or I'm poor, a documented mental impairment, which was in the record from 1996, she's functionally mentally retarded, an ALJ should not proceed without a representative. I didn't say a lawyer because this woman doesn't know what she doesn't know, and she doesn't know how to argue her case. And I think it's time for a precedent here that if there's documented mental retardation, then a representative has to be appointed. There are free representatives, but the ALJ can pick up the phone and say, hey, legal aid, hey, anybody, get down here next time. And after Dr. Candela came back with his 67 IQ, what prevented the ALJ from scheduling a supplemental hearing and again telling them, you know what, I think you need a representative. Yeah, there was no process after that. That was after the fact. Now, for sure this report 270-271 was before the ALJ? Judge, it's in the transcript. I wasn't her lawyer. She didn't have a lawyer. How did it get in here? It's in the transcript. It's referred to in the transcript? Or you mean it's attached as an exhibit? It's part of the medical record. Okay, I couldn't tell how much. All I can say is I didn't send it in, and I don't know who would have sent it in. I can't swear it was there. We don't know when. Right, but this transcript was certified October 25, 2005 by the government as the administrative record. I take them at their word. You know, there was an article in the New York Times. I sure do. And I was going to say, I'll bet you read it. I could have written it, Your Honor. It didn't scratch the surface. The article pointed out, and I read it, the number of reversals. Two-thirds. Two-thirds. Were they referring to reversals by ALJs of administrative terms? Yes. That's what I thought. Yes. Because in this court and in the district court, that figure doesn't go at all. No. It's those people who were denied at the lower levels of adjudication who then won their case at an ALJ. Two-thirds. But according to that article, you know, a big majority win them. Yeah. Yeah. So what you're saying is you think that's true? There's no doubt. There's no doubt. The amazing part is not that two-thirds win. The amazing part is that you have to be denied twice to see a judge. Can you imagine if, God forbid, I get hit by a truck and my wife files an application, why can't it be six months later, eight months later, they collect all the medical evidence, I go see a judge? Why do I have to get a paper denial and another paper denial? Well, the article also said because 40 percent of people get those paper denials and throw them away. And actuarially, it's much better for the commissioner because they never get to see these cases. What you're saying in a nutshell, as I understand it, is there was a failure to explain the 25 percent contingency fee. But in addition, you have to adjust. It's not a hard and fast rule. You have to adjust the information that's given according to the mental ability of the person. And taking that into account, someone should have been appointed from the onset. Is that what you're saying? Yes. Okay. Mr. Alter, I know we have corresponded with you previously with respect to statements made in your briefs. Here, you obviously believe that the ALJ did not do a good job. But again, you talk about the fact that the ALJ willfully or ignorantly ignored. I mean, there is no precedent here that says what you want us to say precedentially. The ALJ obviously missed something, perhaps was neglectful. But again, I would ask you not to make the overly critical statements that you seem to like to make with respect to the ALJ, including talking about the reality of ALJ bottom feeding. Your Honor, all of this is part of my rhetorical past, and it does not occur anymore. Thank you. We'll hear from you on rebuttal. I just said that. I mean, here, he's as close to being right as he can get. Oh, I agree. I agree. May it please the Court. My name is Somra. I'm a Special Assistant United States Attorney from the District of New Jersey, here representing the Commissioner of Social Security. What does that mean, Special Assistant? I actually am employed by the Social Security Administration, but I argue on behalf of the U.S. Attorney's Office in the District of New Jersey. Have you reviewed the transcript and specifically the colloquy that the ALJ engaged in with Ms. Viveritas? I did, Your Honor, and in fact, I think, unlike in most transcripts that this Court may have reviewed, I think the judge, the ALJ in this case, went out of her way to explain what she is not required to do. She's not required to tell a claimant that she has a right to representation at the hearing. But this judge went out of her way to identify that both that the claimant had a right to representation, that there was the availability of free counsel, and as Your Honors pointed out, if the claimant wasn't willing to take free counsel, why would she necessarily want to take counsel on a contingency basis? Well, I'm just bothered by the fact that when she says she was looking for legal aid but couldn't find it, the ALJ then proceeded to state the options in about 16 lines here, saying that she could have a fair hearing with or without a representative. It's a personal choice. It says you can proceed today without a representative or she could adjourn. If you proceed today and there are documents missing, I can take steps to get the documents. Also, if you proceed today and for some reason you're not happy with the decision, you'd be free to appeal and you could get a representative at that time. So what's your decision? But what she didn't mention is that if you proceed today and you're not happy, the battle you will have to fight in terms of overturning what I decide is pretty steep. So you better think twice about it. I mean, isn't that a pretty important statement to be made to someone who's there unrepresented? She sounds like, well, if you don't like it, then you can have a do-over. Isn't it pretty important for the ALJ to advise of the burden that will be placed on the claimant if they are trying to overturn the decision? Well, there are two things, Judge. One, the ALJ gave the claimant the option to postpone the hearing. She was more than willing to postpone the hearing. Which she could have done if she'd known what a fix she'd be in if she proceeded and didn't like it. Well, also, if she postponed the hearing, the wait time would be then for the hearing as opposed to the wait time in court. But more importantly, this is a non-adversarial process. The ALJ told her that she would develop the record. Plus, there's every indication that the ALJ did exactly that. She twice requested records from her treating physician, Dr. Abu Bakar. And despite the fact that the claimant failed to show up for two consultative examinations previously, the ALJ rescheduled those consultative examinations, asked the claimant at the end if she had any further questions or wanted to tell the ALJ anything else. It's just at the outset, the person said, I went to check because I can't afford, and I was looking for it. Which says to me, I really wanted counsel, but I couldn't find counsel. And it's not like, well, I have decided I want to proceed without counsel. I just couldn't find it. Just the record to me is a little bit thin on that issue. Well, let's assume that we accept that Your Honor says that it's thin there. As I stated, this is a non-adversarial proceeding, and there's no indication that an attorney would have done anything more than this ALJ did in assisting this claimant in developing the record. So all the evidence was obtained in this record, and in addition, the ALJ ordered additional consultative examinations. What about the fact that she has lost jobs because she has migraines that last for three or four days, maybe up to a week every month? And clearly, she's testified without the aid of counsel that she can't hold a job because of this. If someone has these migraines of this magnitude, how can they hold a job? Two issues, Judge, I'd like to address. Counsel claims that the plaintiff in this case was laid off from every job. The record actually shows that the claimant testified that she actually left two of the jobs to go to the next job. She was not laid off. She was laid off from her last job. Further, the claimant testified that the frequency of her headaches were actually once per month lasting two to three days. So the indication is that she was laid off from the last job, which she attributed to migraine headaches. Well, the record shows she's had migraine headaches for a long time. Right, which actually helps the commissioner's argument that she's had these migraine headaches for a number of years,  It's not accurate that she was laid off from every job. She herself testified that she left two of the jobs to go to the next day of her job. All right. Another question. Why doesn't she fit within 12.05c? Okay. 12.05c requires that the person have a sub-average intellectual function. Which she did here at 67. Right, which is generally shown through the IQ testing. And two, and most importantly, that she had deficits in adaptive functioning. So she had migraines and asthma, so she had two, didn't she? Those are not deficits in adaptive functioning. That's the third. To meet the listing, she has to meet all the criteria of the introductory description, which pertains to mental retardation, which would be the low IQ, the deficits in adaptive functioning, and both of those manifesting themselves before age 22. In addition to that, 12.05c requires that she have an additional severe impairment. Those would be the asthma and the migraines. Right. But here she, first, Dr. Candela does not diagnose mental retardation, but borderline intellectual functioning. In the American Psychiatric Diagnostic and Statistical Manual, there's a distinction drawn between borderline intellectual functioning, which pertains purely to academic functioning, as represented by low IQ scores, and mental retardation, which in addition to the low IQ, you must show deficits in adaptive functioning. In fact, the DSM states that where the IQ is lower than 70, mental retardation cannot be diagnosed unless, in addition, there are deficits in adaptive functioning. Well, then couldn't a lawyer have known that and put that into the record and investigated this and gotten her qualified under 12.05 as disabled? But the record here is fully developed. There is no indication that this plaintiff has deficits in adaptive functioning. Dr. Candela did not diagnose mental retardation, which requires deficits in adaptive functioning. The record shows that this plaintiff worked for a number of years. She raised a child. She shopped. At Step 5, didn't the non-exertional impairments require an expert opinion? This case was decided at Step 4, the sequential evaluation. The commissioner's regulations state that once a finding of disabled or not disabled can be determined at any step, the commissioner does not proceed to the next step. But shouldn't the ALJ have set forth the Step 4 prior employment tasks? I don't think that was set forth, was it? Pardon me? Could you repeat your question? Shouldn't the ALJ have set forth the Step 4 prior employment tasks? The ALJ did do that. He assessed her residual functional capacity, stated what it was, and then, as allowed by the regulations, compared that residual functional capacity to the requirements of the job, as stated in the U.S. Department of Labor's Dictionary of Occupational Titles. The district court acknowledged that as well, that the residual functional capacity found by the ALJ comported with that description in the DOT for that of teacher's aid. Since the residual functional capacity matched that of the DOT, she was found properly not disabled. And you're saying that we don't get to 5 is what you're saying. Exactly. Would you have a problem with our stating that in a situation where there is mental retardation, at least in the record, there is an opinion as to deficiencies in that regard, that the ALJ must satisfy herself that she has fully explained the ramifications of proceeding without a representative and is satisfied that the claimant fully understands those implications? First, Your Honor, I want to stress again that this claimant is not mentally retarded. There is no diagnosis of mental retardation. There is no showing of deficits in adaptive functioning. Yes, she has a low IQ, but low IQ in and of itself. All right.  Would you have a problem with that? The regulations and the HALACs does not require, as I stated before. You said that before, but we have case law that says you should do that, a lot of cases, maybe not precedential in this circuit, but there certainly is a wealth of case law out there saying that you should explain the valuable role that an attorney could play, the possibility of free counsel, and the 25%. You agree that that's out there? Yes, Judge. Why wouldn't you comply with that with somebody like this? The case law actually sets out a two-part test. One, there's the knowing part of the first step is the knowing part. Here, the commissioner acknowledges that it wasn't knowing in that the ALJ did not set out that the claimant could obtain an attorney on a contingency fee basis. But the second prong of the test is that the claimant has to show that she was prejudiced. The case law says in order to show prejudice, the claimant has to show that the ALJ failed to fully develop the record. Here, the record was fully developed. The ALJ went out of her way to solicit all the treating sources' records and, in addition, hired consultative examiners. In addition to that, after the ALJ obtained the report of the consultative examiner, she forwarded it to the claimant with a cover letter asking her to review it and telling the claimant that if she had any questions and, also importantly, if she wanted a supplemental hearing. Now, what kind of a review is she going to be able to conduct? I have a law degree, and I went over this and I went over it and over it. And for a lay person to look, well, never mind. If you'd like me to respond to that. All right, go ahead. It's not that the claimant has to review it for legal analysis because, as I stated before, this is a non-adversarial proceeding. The claimant has to review it for accuracy. It was a claimant that was present at the consultative examiner and knows what she told the consultative examiner. The ALJ, unlike Mr. Alter's claim, is not going to go out of her way to deny the claimant based on some sort of legal technicality because she's without counsel. It's the ALJ's duty to represent, to provide support for the unrepresented claimant, not to go out of her way to come up with a legal technicality as to why she should be denied. But I'm trying to remember what we learned. Maybe they don't use these categories anymore. Would you concede that a person with that level IQ is what – I don't mean any disrespect to the claimant, but didn't we use to call people in that category a moron? Wasn't that the – and I don't mean that disrespectfully, but I think – wasn't there were idiots, imbeciles? It wasn't moron below 75? Isn't she basically a medium-grade moron? What – Judge, I think that may be before my time because I actually am not familiar with that. I realize people use it in a slang form in a very disrespectful way, and I don't mean it that way at all. This is a serious matter. But that's what struck me, that you have a person at a level below – I don't even think the Army would take someone at that level. And I have to ask myself how meaningful what she was told really was. If there shouldn't be, as Judge Rendell has indicated, perhaps a rule for people in this category. Well, I want to stress one more time, Judge, that the low IQ in and of itself does not display mental retardation. This claimant does – Our cases really haven't said that. There has to be an explicit finding. I think the Seventh Circuit has a case that says when a claimant may be incompetent or may have mental illness, there should be greater explanation given. Right, and that is not the case here. I mean – Well, she couldn't find legal aid. She could not – somebody said it was on this, and I couldn't find it. That plus what's in the record about she acts more – she acts mentally retarded and has, you know, a first grade. That should clue you that extra care is going to be needed to make sure this person can handle this and knows what she's giving up if she does choose to handle it. Well, first, Judge, the fact that she couldn't find it doesn't necessarily indicate that it's because of her mental functioning. She probably may just have not been able to locate it. Secondly, the report that counsel cited to, the 1996 IQ psychological report, one was outside the period under review. In fact, it was from 1996, and thereafter, the claimant was able to obtain an associate's degree in child development and obtain jobs that lasted full years. She had significant gainful activity. In addition, the functioning that the psychologist attributed the fact that she, quote-unquote, functioned like a retarded person, not to her intellectual abilities, but to the fact that at the time she was experiencing depression due to the death of her brother. So the functioning is not related to her IQ, but rather to her emotional state at the time due to her brother's death. Thank you, counsel. I have four things in three minutes. You know, one time I was looking for the Social Security office in Trenton, and I had the address and I couldn't find it. And I sat there and I thought about it. It's a fact I'll never forget. It reminds me of it. It's in a shopping center, and I couldn't find it. But, of course, not having a 67 IQ, I said, if I sit in my car long enough and I watch the traffic on feet in here, I'll find it. And I did find it. I followed the crowd. But I couldn't find it because you had to go on the side, and it wasn't obvious to me. So it's not easy necessarily to find places. I taught us in law school, Your Honor, that if you can find the courthouse, you're 90% there. Let me just say, in rebuttal, my colleague on the other side says she doesn't meet 12.05C because she needs one more thing, and that is adaptive functioning. She has to have problems with adaptive functioning. But that is exactly what she functions as a mentally retarded person means. That's the missing link. That's it. She meets the listings. But the ALJ didn't mention it. Yeah, the ALJ didn't analyze 12.05C at all. They threw it in, a reference, but that was it. Well, that's because, you know, this court has said that we're not forcing you to compare at step three. You know, it's more of a subjective test. This court's got to make them do that. This court also has to make them appoint or arrange for a representative from, you know, there's plenty of these organizations that have representatives who know Social Security who aren't lawyers. But what if she says I don't want one? She doesn't get that charge, Judge. Corporations can't walk in here without a lawyer. But we're not about to make a rule that every individual that walks in has to have a representative. No, every individual with cognitive or psychiatric problems that are available in the record before the hearing, not to crop up later on. I was never a judge, but I know for a fact that a judge looks at a case beforehand and she sees this report. That's number one. Number two, my colleague keeps saying she's not mentally retarded. She's not mentally retarded. 12.05C, which says if you have a 50 to 70 IQ, excuse me, has a headache. What does it say? Mental retardation. I don't care what the DSM says. The commissioner calls it mental retardation. I want to answer Judge Greenberg's question about the RFC. RFC is for simple, unskilled work under the commissioners. Did we have the wrong name in front of you? It was Judge Van Antwerpen. That's okay. Oh, I thought you said Judge Greenberg. Yes, because that happened earlier in the arguments, and I was thinking, gee, I'm sure that Judge Greenberg asked it, not this Judge Greenberg. You know, there's a celebrated colloquy in the Supreme Court where some lawyer, I read the colloquy, was addressing the judges by the law, the justices by the law. I was there, Your Honor. Oh, you were there? I mean the Supreme Court of Washington. It was Bush v. Gore. Was it Bush v. Gore? Oh, my God. Well, there was one Bush v. Gore. It was horrible. I was there when my adversary said, called, made a mistake in the two female judges. Oh. And Judge Ginsburg. They all look alike. That's right. Scene one, scene them all. He called Judge Ginsburg, Judge O'Connor, and Judge Ginsburg was not happy and said, no, no, no, no, no. I'm Ginsburg. No, it was Scalia, I think, got the wrong call, the one I read. Anyway, I was wondering why that happened, because in the prior argument someone addressed and I apologize. It's no problem. We are supposed to follow the labels. They were painting, I have to tell you. All right, we're going to give you. Can I tell them, they were painting the courtrooms in Northampton County and President Judge Palmer was using Judge Griffo's courtroom and he got done imposing sentence and the defendant said to the judge, you dirty louse, I'm going to kill you, and he said, just ask for me, Judge Griffo. So go ahead, I'm sorry. All right, we'll give you, put two minutes on so we can take out the banter. Judge Van Antwerpen asked the question, is the RFC correct? The answer is as follows. Number one, we never get to the RFC if she meets the listing. We never get to step four before we resolve step three, and she didn't resolve step three, number one. Number two, let's assume the government gets past step three. Then your honest question makes a lot of sense. An RFC to do unskilled work, according to the commissioner, SSR 85-15, they always use this against me, I've been using it against them once, is the ability to understand, carry out, and remember simple instructions. That's basic unskilled work. According to Dr. Candela, who the ALJ sent her to that doctor, she has cognitive limitations and her memory function is impaired, which may tell us why she keeps losing these jobs. Lastly, my colleague says, oh, she was only laid off from one job. She may be right, but the way I'm reading transcript 33, 34, and 35, and it seems to me that she keeps saying the same thing. I was in Miles Square, and then they laid me off in October. Then she says I was in Abbott Program, the growing tree. I was laid off there. And then finally she says one of those jobs, I had a lot of absences. She also said she only worked for two to three hours a day in some of these jobs. Look at her earnings record. Her earnings, the woman has never made any money because she works. The most she ever made was $11,000 a year, and that was two years before she applied. So if this, there are so many cases like this that we never know about. Here is the opportunity because we do know about it. This woman walked into my office. I hope that the court will make some sort of a rule that can prevent this kind of thing from happening because basically these people never seek redress. Thank you very much for hearing me. Thank you, Counselor. Yes, case is well argued. We're taking our advisement. We're going to take a five-minute recess.